STATE OF IOWA, appellee, v. LARRY D. JACKSON, appellant.

No. 49758.

(Reported in 101 N.W.2d 731)

538

 

MARCH 8, 1960.

Don H. Jackson and Addison C. Kistle, both of Council Bluffs, for appellant.

Norman A. Erbe, Attorney General of Iowa, Marion R. Neeley, Assistant Attorney General, and Matt Walsh, County Attorney of Pottawattamie County, for appellee.

THOMPSON, J.—The defendant is a Negro, 36 years of age at the time of the events referred to herein. On the evening of July 13, 1958, Joseph Dixon, age 18, and Rita Jeane Ficke, 15, were seated in an automobile bearing dealer's license plates, near Carter Lake. They had driven around Omaha for a time and about 9:30 parked on a road near the lake. Carter Lake, although lying on the west side of the Missouri River adjacent

to Omaha, is a part of the State of Iowa and for governmental purposes of Pottawattamie County.

After Dixon and Miss Ficke had been parked for about 45 minutes, the defendant appeared, climbed into the back seat of their car, displayed a gun, described in the record as a police positive revolver .38 caliber, and told them it was a "stick-up" and no joke. He ordered Dixon to keep his hands on the wheel and to start driving. Miss Ficke testified the defendant used much foul language and told them they would " 'be lucky to get out alive.' " After Dixon had driven a short distance the car became mired in a mud hole and he could not get it out.

The defendant then ordered them out of the car and to "shut up and keep walking." Miss Ficke testified "he said he was going to kill us." He said that several times. After they had walked for some distance the defendant said that was far enough. He put his left hand on Miss Ficke's shoulder and said "You are coming with me." Dixon at this point said "Don't touch her, I'll kill you." Dixon was about nine or ten feet from the defendant at this time, and according to Miss Ficke the defendant then "fired the first shot." Dixon thereupon charged him, and they fell to the ground. During the melee another shot was fired. Miss Ficke then "yelled that somebody was coming" and the defendant got up and ran. It was then discovered that Dixon was shot; the evidence showing that the bullet entered his back, coursing through his chest and causing his death within a short time, perhaps within an hour and certainly from the effects of the gunshot wound in his back.

The defendant had driven to the scene of the tragedy in an automobile which he owned and it was found parked near the Dixon car. His confession which is not challenged as to being voluntary and his testimony in the case both say that he was attempting to get a car which he could drive to Chicago, his own not being operable for a trip of that distance. Through his abandoned automobile the defendant was shortly traced and apprehended. There was much other evidence connecting him with the crime, and his own confession and testimony admit the attempt to steal the Dixon car and the events which transpired, much as does Miss Ficke's testimony. He denies the use of threats or foul language or any order to Miss Ficke to

leave the scene with him, and says he had no intent to shoot Dixon, claiming the discharge of the revolver to have been an accident during the course of the scuffle with the deceased. Other facts in evidence will be referred to in the course of the opinion following.

 Since the defendant's assigned and argued errors, except those referring to the claimed erroneous sentence, deal with what is claimed to be lack of evidence in the State's case, we follow the rule that we take the facts most favorable to the State; that is, in his contention that there is no support for the verdict and judgment, we look for substantial evidence, whether or not contradicted by the defense. The trial court submitted the case to the jury in accordance with the indictment; and in so doing submitted murder in the first degree, murder in the second degree, manslaughter, and not guilty. The jury returned a verdict of murder in the second degree. The court entered judgment on the verdict, and sentenced the defendant to imprisonment in the state penitentiary for a period not to exceed seventy years.

I. The defendant assigns eight errors relied upon for reversal. One of these is that the court was in error in sentencing him under the indeterminate sentence law, and the sentence is excessive. This contention will be discussed in a later division of this opinion. The other assignments may be summed up in these statements: The court erred in submitting first-degree murder; and submission of first-degree murder, when the evidence does not warrant a finding thereof, is reversible error, even though the conviction be for a lesser offense. Since we do not agree with the first contention, we do not find it necessary to determine the second one.

II. Defendant's theory that submission of first-degree murder was not permitted by the record in the case is based upon the apparent claim that the evidence does not show a willful, deliberate and premeditated killing; nor does it raise a jury question that the killing was committed in the perpetration or attempt to perpetrate any arson, rape, robbery, mayhem or burglary. It is the State's contention that Joseph Dixon was killed in the perpetration of a robbery or at least in an attempt to commit a robbery. But the defendant here turns to the statu-

tory definition of robbery and contends that the stealing of an automobile is not larceny under the Iowa statute, and so no robbery or attempt to commit robbery was committed. The statutes defining murder in the first degree and robbery are important here, and we set them out.

Murder of the first degree is defined in Code section 690.2, Code of 1958, as follows: "First-degree murder. All murder which is perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate any arson, rape, robbery, mayhem, or burglary, is murder in the first degree, and shall be punished with death, or imprisonment for life at hard labor in the penitentiary, as determined by the jury, or by the court if the defendant pleads guilty."

Robbery is defined in these terms in Code section 711.1: "Definition—punishment. If any person, with force or violence, or by putting in fear, steal and take from the person of another any property that is the subject of larceny, he is guilty of robbery, and shall be punished according to the aggravation of the offense, as is provided in sections 711.2 and 711.3."

■ III. Defendant's first argument is that there is no sufficient showing that the automobile which the defendant was attempting to take from Joseph Dixon was either owned by him or was in his lawful possession. It is conceded that ownership is not necessary; larceny is committed by a wrongful taking from one who has rightful possession. State v. Schmidt, 239 Iowa 440, 442, 30 N.W.2d 473, 474; State v. Henderson, 215 Iowa 276, 279, 243 N.W. 289, 290; State v. Stanley, 48 Iowa 221, 222. Admitting this, the defendant urges that there is no evidence the car was rightfully in Dixon's possession.

■ But the witness Ficke said the car was "Joseph's." In addition, it is well settled that "a rebuttable presumption exists that those in possession of property are rightly in possession." 73 C. J. S., Property, section 17, page 211; Myerscough v. Garrett, Tex. Civ. App., 45 S.W.2d 1003, 1005; Swanstrom v. Bell, 67 Idaho 554, 186 P.2d 876, 878; In re Estate of James, 267 Wis. 105, 65 N.W.2d 9, 17. There is no showing that the car was not rightfully in Dixon's possession, and accordingly the presumption governs.

 IV. It is the further contention of the defendant that the unlawful taking of an automobile is not larceny within the meaning of our statutes, and so it follows that the taking of such an article of personalty with force and violence is not robbery as defined by section 711.1, supra. That is to say, an automobile is not the "subject of larceny." So it is defendant's thought that he was not engaged in the commission of a robbery or an attempt to commit a robbery, and thus not guilty of murder in the first degree in the absence of a showing of an intent to kill.

But we think, and so hold, that an automobile may be the subject of larceny. It is true that we have a separate statute providing for the punishment of one who steals an automobile. Section 321.82 of the Code, labeled, presumably by the Code Editor, "Larceny of Motor Vehicle", says: "If any person steal, take and carry away, irrespective of value, any motor vehicle, he shall be punished by imprisonment in the penitentiary not more than ten years, or by fine of not more than one thousand dollars, or by both such fine and imprisonment." Code section 709.1, so far as material, provides: "If any person steal, take, and carry away of the property of another any money, goods, or chattels * * * he is guilty of larceny." This is the general larceny statute; and in the absence of section 321.82, supra, there could be no doubt that it would include motor vehicles as the subject of larceny.

 We think that section 321.82 does no more than specify a separate penalty for the larceny of a motor vehicle. Both sections 709.1 and 321.82 refer to and make the gist of the crime the stealing, taking and carrying away of the personal property of another. In State v. Schmidt, supra, at page 442 of 239 Iowa, page 474 of 30 N.W.2d, we gave with approval this definition of larceny from State v. Banoch, 193 Iowa 851, 853, 186 N.W. 436, 437: Larceny is "the wrongful taking and carrying away by a person of the personal property of another from any place, with a felonious intent to convert it to the taker's own use without the consent of the owner." The act of the defendant here in taking charge of the automobile then in the possession of Joseph Dixon comes exactly within this definition. He entered the car and took possession of it from Dixon

by means of a gun. He ordered Dixon to drive, enforcing this command by the use of the revolver and threats. From that time on, the car was no longer in the possession of Dixon, but of the defendant.

The Illinois Supreme Court was faced with substantially the same contention made by the defendant here, in People v. Crane, 356 Ill. 276, 279, 190 N.E. 355, 356. Illinois had a general larceny statute and a separate act covering larceny of a motor vehicle. The court there said:

"Larceny is a generic term, within the broad outlines of which there are many different offenses. These include petit larceny, grand larceny, larceny from the person, larceny of an automobile, larceny of a horse, larceny by embezzlement, and others. The basic distinction between the different kinds of larceny is principally a matter of the punishment to be inflicted, requiring different allegations and different proofs for the various grades and degrees of the crime."

In Illinois, as in Iowa, the statute covering the theft of a motor vehicle did not specifically name the offense as larceny. The defendant here says the legislature has never said that the wrongful taking of a motor vehicle is larceny. In specific words, this is true; but it has used identical words which we have said define larceny. To say that the crime defined by section 321.82 is not a larceny because the act does not contain that exact word would be to put the shadow ahead of the substance. We agree with the Illinois court that the difference in the general larceny statute and those referring to specific wrongful taking, stealing and carrying away crimes is only one of the degrees of the punishment. The wrongful taking of a motor vehicle, as referred to in section 321.82, is larceny, with a different punishment provided.

V. Again, the defendant argues that if he had ever been engaged in the crime of larceny he was no longer so at the time of the killing. He urges that he had abandoned the attempt to take the car before the shooting occurred, and cites State v. Lewis, 173 Iowa 643, 154 N.W. 432, Ann. Cas. 1918A 403, and other authorities. The difficulty with defendant's position here is that the facts do not fit the cases cited. His confession and his testimony show that he had not abandoned the intent to take

the car until after the shooting. As a witness he said that when he ordered Dixon and his companion to walk down the road, his purpose was "to take them down the road so they couldn't call the law on me before I could get out of town with the car. I was going to get them far enough away from the car so they couldn't get to the law before I got to the car." His confession says that after the fight and the shooting "I run back to the car to get the car and the key was gone; he must have took the keys out of the car." Even after the struggle he still meant to take the car, and was balked only because the ignition key was missing.

VI. It is our conclusion for the reasons expressed above that there was substantial evidence the defendant killed Joseph Dixon while engaged in the perpetration of a robbery, and so the submission of murder of the first degree was justified. It also seems there was evidence of an intent to kill sufficient to require the submission of this degree of the offense within the terms of section 690.2, supra, even without the showing that the killing was committed in the commission of a robbery. Rita Jeane Ficke testified concerning the incident immediately preceding the struggle between the defendant and Dixon: "As we approached the last stop the man said I am to come with him. He placed his hand on my shoulder and Joe says 'Don't touch her or I'll kill you', and the man turned and fired." This was denied by the defendant; but it engendered a jury question. ▮▮ We have held that premeditation and deliberation need not exist for any particular time previous to the killing. The use of a deadly weapon with opportunity to deliberate is evidence of malice, deliberation, premeditation and intent to kill. State v. Nutter, 248 Iowa 772, 778, 81 N.W.2d 20, 23; State v. Leedom, 247 Iowa 911, 918, 76 N.W.2d 773, 777; State v. Heinz, 223 Iowa 1241, 1259, 275 N.W. 10, 20, 114 A. L. R. 959. He who goes armed with a deadly weapon, such as a loaded revolver, for the purpose of committing a robbery, and uses it in the course of the robbery, is not in a strong position to urge that there was no evidence of deliberation or premeditation.

VII. We turn then to the question of the sentence. As pointed out above, the trial court sentenced the defendant to

546

be imprisoned in the state penitentiary "not to exceed the period of Seventy (70) years." The court also provided that "Sentence is being imposed under the provisions of Section 690.3 of the 1958 Code of Iowa."

 The defendant contends that the words "not to exceed" show that the trial court attempted to sentence the defendant under the terms of the indeterminate sentence law; and that this law, by its express terms, does not apply to convictions of murder. It must be conceded that Code section 789.13, the indeterminate sentence law, is not applicable to murder, and sentence may not be pronounced under it when the conviction is for such offense. Treason or murder or any crime the maximum penalty for which is life imprisonment is expressly excepted from the act.

 The State contends that the sentence is for a definite term of seventy years. The defendant denies this, and in addition urges that, if it is to be construed as the State would have it, it is excessive. We are of the opinion the sentence lacks that definiteness required in punishment for crimes. The judgment of the trial court should be stated so certainly that the warden or other officer may understand and execute it. 15 Am. Jur., Criminal Law, section 443, page 103; 24 C. J. S., Criminal Law, section 1581b, page 104; Ex Parte Frazier, 164 Tex. Cr. Rep. 572, 301 S.W.2d 655, 656; People v. Jackson, 399 Ill. 488, 78 N.E.2d 211, 212; State ex rel. Petcoff v. Reed, 138 Minn. 465, 163 N.W. 984, 985.

 Measured by this rule, we find the sentence too indefinite to be permitted to stand. Whether the trial court attempted to sentence under the indeterminate sentence law we do not know. The words "not to exceed" give that impression; they are commonly used when sentencing under that act. But what the court did is of far more importance than what it thought it was doing. A sentence of "not to exceed" seventy years for murder lacks certainty, and gives the officers of the state penitentiary no sufficient knowledge of what it may be. Any term of years from seventy down at least to ten, the minimum sentence permitted by the statute, meets the stated requirement of "not to exceed seventy years." We ourselves have disap-

proved this form of sentence in State v. Nova, 206 Iowa 635, 637, 220 N.W. 41, 42; and in State v. Sayles, 173 Iowa 374, 383, 155 N.W. 837, 840. In the former case the sentence was "not to exceed six months" in the county jail. We said: "The form of the entry in this respect is objectionable"; and we proceeded to state the actual sentence. In the Sayles case, supra, there was a conviction of murder in the second degree, and the sentence was to the state penitentiary "at hard labor for an indeterminate period, as provided by law." We pointed out that murder is not within the purview of the indeterminate sentence act, and this court imposed a sentence of ten years, which it found proper under the circumstances of the case.

 In many jurisdictions the remedy for such a situation is by remanding the defendant to the trial court for a proper sentence. But in Iowa we have Code section 793.18, which we quote:

"Decision of supreme court. If the appeal is taken by the defendant, the supreme court must examine the record, without regard to technical errors or defects which do not affect the substantial rights of the parties, and render such judgment on the record as the law demands; it may affirm, reverse, or modify the judgment, or render such judgment as the district court should have done, or order a new trial, or reduce the punishment, but cannot increase it."

This gives us the power to impose a proper sentence, and it has the advantage of avoiding a further appeal which might be taken if we remanded and the trial court imposed a sentence thought by the defendant to be excessive.

We are faced then with the difficult question of what is a proper sentence, fair both to society and to the defendant. Counsel urge that the defendant is an illiterate Negro, who had had few advantages in life and has a low intelligence quotient; in fact, about that of an eight- to ten-year-old child. It is also contended that there is serious doubt whether he meant to fire the shot that killed Dixon. On this latter point, however, the jury quite evidently found against him. Indeed, one who arms himself with a deadly weapon and goes out to rob, and who kills his victim when he resists, can seldom convincingly urge that the shooting was accidental. He says, in effect, "Give

me your property or I will kill you." When the event which he threatened happens, he has small complaint if he is held to have carried out his threat.

It is true the defendant was illiterate and had a low I.Q.; and that he had not been in previous trouble with the law. He was 36 years of age at the time of the murder. Dr. James D. Mahoney, the psychiatrist who testified for the defense, after telling of Jackson's low intelligence quotient, also said he found no evidence of either psychotic or insane reaction; "he isn't considered feeble-minded. He is aware of what is going on; he knows what should be done and what shouldn't be done."

Citation of authority from cases in which the courts have, or have not, reduced penalties imposed by trial courts is of small aid. Each case will differ so widely on the facts that it gives no help in determining what is a just sentence. Of late years, we have gone to great, sometimes fantastic, lengths in making sure defendants have due process of law; and we have much concerned ourselves with rehabilitation of those convicted. It has become increasingly apparent that public concern is largely directed to sympathy for the unfortunate situation of the defendant who commits a serious crime and finds himself confronted with a day of reckoning. Weeping for criminals is a common facet of our life nowadays; weeping for their victims is too often left to the victims themselves, or, if they have unfortunately not survived the crime, to their relatives.

So we are losing sight of the major purpose of law enforcement, which must be to give warning to those tempted to commit like offenses. If we do not promptly and adequately punish the criminal for his crime, we shall soon have more criminals and more crimes; and indeed the number of crimes of violence is increasing rapidly in the United States. Cruel, unusual and excessive punishments should not be imposed; but we should not hesitate to render fair and adequate judgments as a notice to others that crime has its penalties. This, we believe, is the real meaning of the Old Testament injunction of "An eye for an eye, and a tooth for a tooth." It is that the punishment should be in proportion to the crime.

We are not permitted to increase the sentence of the trial court. It is evident it did not think the maximum of life imprisonment should be inflicted. Whether the court thought seventy years was fair, or whether it was of the opinion it was merely fixing the maximum, with the actual time served to be determined by the board of parole under the indeterminate sentence law, we cannot be sure. We must make our own determination.

The defendant was ignorant, uneducated, and had no previous record. But he knew what was right and what was wrong. It did not require education or high intelligence to realize what he did was wrong. He was, by his own account, guilty of embezzlement from his employer; he says he wanted Dixon's car to go to Chicago to borrow money to make up his defalcations in rents which he had collected. He was, on the evidence and his own testimony, guilty of armed robbery; that is, robbery with aggravation, as defined by section 711.2 of the Code. He was also certainly guilty of kidnapping when he. entered the car and, by threats and the display of the revolver, compelled Dixon and Miss Ficke to go with him for whatever distance it may have been, both in the car and on foot. Then followed the incident which the jury has characterized as murder. Citizens are entitled to protection from such conduct. The jury has already extended a considerable measure of leniency to the defendant by failing to find him guilty of murder of the first degree. There is nothing we can do for Joseph Dixon now; but a proper sentence, commensurate with the crime committed, may save some future Joseph Dixon from a like fate.

We conclude a sentence of fifty years confinement at hard labor in the state penitentiary at Fort Madison is proper under all the circumstances here, and such is the judgment of this court. Costs are taxed to the defendant.—Affirmed, with sentence by this court.

All JUSTICES concur.